**Scott M. KAYLOR, Plaintiff,**

v.

**FANNIN REGIONAL HOSPITAL, INC., Defendant.**

**Civil No. 2:95–CV–0067–WCO.**

United States District Court,
N.D. Georgia,
Gainesville Division.

Oct. 22, 1996.

Mary R. Carden, Carey Jarrard & Walker, Gainesville, GA, for plaintiff.

Benton J. Mathis, Jr., Christopher Evan Parker, Drew Eckl & Farnham, Atlanta, GA, for defendant.

## *ORDER*

O'KELLEY, Senior District Judge.

The captioned case is before the court for consideration after a bench trial was held on September 16 and 17, 1996, in United States District Court, Gainesville, Georgia. Plaintiff's causes of action are a case of first impression in this court as plaintiff's claims arise under the Family Medical Leave Act, Pub.L. 103–3, 107 Stat. 6, which was enacted on February 5, 1993. In accordance with Fed.R.Civ.P. 52(a), the following opinion constitutes the court's findings of fact and conclusions of law.

### I. Findings of Fact

Jurisdiction is uncontested and is based on federal question jurisdiction pursuant to 28 U.S.C. § 1331. Plaintiff's claims relate to a violation of a federal statute: The Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 *et seq.*

Defendant Fannin Regional Hospital ("Fannin Hospital") is an acute care facility which serves North Georgia, Southeast Tennessee, and Southwest North Carolina. Defendant is located in Blue Ridge, Georgia. Plaintiff is a resident of Mineral Bluff, Georgia, and was employed as a C.T. technician by Fannin Hospital beginning in March of 1989 until his termination on February 8, 1996. Plaintiff's duties included cat-scans and routine x-rays. The parties agree that plaintiff is a competent and skilled C.T. technician, and during his almost six (6) years in Fannin Hospital's employ, plaintiff received very good to excellent performance reviews from his supervisors.

Prior to his employment at Fannin Hospital, plaintiff injured his back on two occasions. Plaintiff's back injuries resulted in back surgery and epidural blocks. Plaintiff

currently suffers from degenerative back disease which causes chronic lower back pain. As a result, plaintiff has some limitations on his ability to lift objects and to travel. Fannin Hospital was aware of plaintiff's prior back injuries and current physical limitations when plaintiff was hired in 1989. At the time of his employment by Fannin Hospital, plaintiff regularly saw Dr. Greg Myerson for treatment of his back injuries.

In May of 1991, plaintiff signed an acknowledgment of his receipt of the Fannin Hospital's policies and procedures as outlined in its Employee Handbook. This handbook states that plaintiff's employment was "terminable at the will of either myself or the Employers for any reason...."[1] The handbook also provides that plaintiff was entitled to eighty (80) hours of vacation leave, two floater days, and ninety-six (96) hours of sick leave accruing each year. Unused sick leave in one year could be carried over to the following year. Plaintiff was provided with copies of Fannin Hospital's Employee Handbook at his original orientation. Plaintiff was subsequently provided with any changes to Fannin Hospital's administrative policies and procedures on an annual basis throughout his employment.

Fannin Hospital provided notice of the FMLA after its enactment in 1993 by providing a copy of its Family and Medical Leave policy with its updated Employee Handbooks. Fannin Hospital also set up posters discussing the FMLA in employee break rooms. Furthermore, Fannin Hospital instructed employees on their rights under the FMLA during Risk Management employee sessions.

During the early part of plaintiff's employment with Fannin Hospital, his supervisor was Mr. Danny Patterson. Mr. Patterson allowed employees to take days off pursuant to oral approval and by writing the proposed day off on the wall calendar in the department. Mr. Patterson also allowed employees to substitute accrued paid leave for unscheduled time off as long as changes to time

cards were done before they were sent to payroll. Mr. Patterson left Fannin Hospital in September of 1993 and was replaced by Ms. Sue Patterson (no familial relation).

In July of 1994, plaintiff was confronted by Ms. Patterson concerning his attempt to change an entry on his employee time card. On July 13, 1994, plaintiff failed to call in or report for work as scheduled. Following his absence, plaintiff retrieved his previous week's time card and attempted to alter his time card to reflect a vacation day for the day he missed. Ms. Patterson confronted plaintiff concerning this alteration and informed him that his actions were improper.

Ms. Patterson ran things differently than her predecessor, Mr. Patterson. Plaintiff was informed that, pursuant to hospital policy, in order to utilize accrued paid time off for his absence, he must provide notice and fill out a form in advance of his anticipated absence. As plaintiff testified at trial, at the end of this conversation plaintiff expressed his frustration by telling Ms. Patterson to "stuff it." In addition, Ms. Tammy Arp, an employee in the radiology department, testified at trial that it was the standard practice in the radiology department under Ms. Patterson to request leave by written notice and thereafter write the day off on the wall calendar in order to alert other employees once approval was granted by Ms. Patterson. Accordingly, the court finds that plaintiff knew that the proper procedure for requesting leave was to fill out a leave request form and receive prior approval.

On December 24, 1994, plaintiff experienced a flare-up of his back injury. On December 27, 1994, plaintiff was admitted to Northside Hospital for back pain and numbness in his lower back and leg on one side of his body. On that same day, plaintiff's wife, Mrs. Debbie Kaylor, called Ms. Patterson to report plaintiff's hospitalization and his anticipated absence from work for at least several days. Dr. Myerson treated plaintiff during his stay at Northside Hospital.

---

1. The Fannin Hospital Employee Handbook states: "I understand and agree that my employment at FRH is for an indefinite term and is terminable at any time at the will of either myself or the Employer for any reason.... I HAVE READ AND UNDERSTAND THE ABOVE STATEMENT AND AGREE TO READ THE EMPLOYEE HANDBOOK."

Upon being informed of plaintiff's illness, Ms. Patterson contacted Fannin Hospital's Director of Personnel, Ms. Lauren Tipton. Ms. Tipton is responsible for the administration of its personnel policies, including Fannin Hospital's Family and Medical Leave Policy. Ms. Patterson then completed the necessary paperwork to provide plaintiff with a medical leave of absence pursuant to the FMLA. Plaintiff was approved for Family and Medical Leave on December 30, 1994.

Plaintiff remained in Northside Hospital until December 31, 1994, after which he was placed on bed rest for two weeks by Dr. Myerson. Plaintiff utilized approximately 120 hours, or three weeks, of eligible FMLA leave during his hospitalization and convalescence. Once the hospital was informed of plaintiff's illness, plaintiff's wife was requested to come to Fannin Hospital and pick up a packet of necessary forms relating to plaintiff's leave with instructions for their completion. Pursuant to Fannin's routine practice, included in these forms were materials explaining plaintiff's rights and obligations under the FMLA. Plaintiff's wife picked up these forms from the radiology department at some point during plaintiff's convalescence.

Plaintiff returned to work on January 18, 1995, after Dr. Myerson signed a certificate of fitness to return to work. Plaintiff's medical certification from his doctor authorizing his return to work did not mention any follow-up appointments or regimen of care. Plaintiff did have an appointment scheduled for February 3, 1995, which he had scheduled at a prior routine visit to Dr. Myerson in November of 1994. Upon his discharge from the hospital on December 31, 1994, Dr. Myerson instructed plaintiff that any follow-up could take place during the course of his previously scheduled regular appointments.

Prior to his hospitalization, plaintiff failed to submit a leave request form for his scheduled doctor's appointment or otherwise notify his supervisor of any planned absence. During the period of plaintiff's hospitalization, his return to work on January 18, 1995, and the ensuing two weeks he was employed at Fannin Hospital, the court finds that the plaintiff again neglected to mention the February 3 appointment to his supervisor, Ms. Patterson.

Plaintiff did not inform Ms. Patterson of his appointment with Dr. Myerson on February 3 until January 30, 1995. Plaintiff originally verbally requested the day off as a vacation day. Ms. Patterson informed him he could not have the day off because the hospital would be "short-staffed" without his presence and that a written request was the proper procedure for requesting leave. Plaintiff subsequently filled out a written request form requesting the day off to attend the appointment. Ms. Patterson again denied plaintiff's request. Plaintiff also recorded his appointment for February 3 in the patient scheduling book and on the wall calendar in the radiology department. It should be noted, however, that writing a requested day off on the wall calendar did not grant a day off pursuant to hospital policy.

Ms. Patterson requested that plaintiff reschedule his appointment because a number of individuals in the radiology department had already been granted leave on that day,[2] including Ms. Patterson, and plaintiff's presence was needed in order to avoid inadequate staffing. There is no evidence that plaintiff made any effort to reschedule his appointment with Dr. Myerson. To the contrary, all evidence suggests that plaintiff never contacted Dr. Myerson after January 19, 1995.[3] Furthermore, plaintiff never canceled his appointment with Dr. Myerson.

---

**2.** Ms. Patterson informed plaintiff that two of the four Radiology Department employees were scheduled to be off that day.

**3.** "Q: Did you see him or talk with him later after his discharge in the month of January?

A: Yes. He spoke with the office on January 4th, and then again on January 19th he spoke with my nurse, Patty.

Q: And do you know what the purpose of those phone calls was?

A: It was he was told to call the office and give me a checkup on how everything was doing. And the last note of January 19th is Patty spoke with his wife, and Scott was back at work doing fairly well."

Deposition of Gary E. Myerson, M.D., Joint Exhibit 20, pg. 10. (September 11, 1996).

On February 1, 1995, Ms. Patterson asked plaintiff for his assurance that he would be at work on February 3rd. Plaintiff indicated he would be there. Ms. Patterson subsequently heard reports from employees that plaintiff stated he was going to call in sick and miss work on February 3 anyway.

On February 2, 1995, plaintiff informed Ms. Amy Chesser, secretary for the radiology department, that he would not be at work regardless of whether Ms. Patterson approved his absence. Ms. Chesser reported plaintiff's comments to Ms. Patterson. Later that same day, Ms. Patterson again asked plaintiff whether he would be at work as scheduled. Plaintiff responded, "I guess I will."

On the night of February 2, plaintiff asserts he came down with a stomach virus which caused excessive vomiting and diarrhea. Plaintiff awoke at approximately 6:00 a.m. and called the radiology department at Fannin Hospital to report he was sick and unable to come to work. When no one answered, plaintiff called the emergency room at approximately 6:40 a.m. and asked the employee on duty to leave a message on the board in the radiology department advising radiology department personnel that he was sick and would not be in. Plaintiff did not call Fannin Hospital again to explain his absence.

The accepted hospital practice for calling in sick at Fannin Hospital is to call the immediate supervisor and inform him or her of the absence. Plaintiff claims he never called Ms. Patterson because he knew that Ms. Patterson was traveling to Nashville, TN, sometime that day. This does not explain why he did not leave a message on her answering machine explaining his absence or why he did not call the hospital personnel department or radiology department later that day explaining his absence.

As a result of plaintiff's absence on February 3, several patients had to be rescheduled and the remaining radiology staff was forced to cover for plaintiff. The hospital had only one employee able to do cat-scans during the day, Ms. Arp, and she testified that she did not feel qualified to operate the cat-scan machine at that time. As a result, only one emergency cat-scan was done on February 3, 1995, with the other patients rescheduled.

Despite his illness, plaintiff's daughter picked him up at approximately 6:45 a.m. on February 2 and drove plaintiff to his scheduled appointment with Dr. Myerson. The drive to Dr. Myerson's office in Atlanta was approximately two hours long. Plaintiff returned to his home in the early afternoon of that same day.

Dr. Myerson testified in his deposition that plaintiff's appointment on February 3 related solely to treatment for his back condition, was not out of any "medical necessity," and was a routine scheduled appointment. Deposition of Dr. Myerson, Joint Exhibit 20, pg. 21. Plaintiff complained of increased back pain, but no mention of plaintiff's sickness was made in Dr. Myerson's notes for that visit even though Dr. Myerson testified he "would have recorded what he had for dinner the night before if it was pertinent." *Id.* at 24. In fact, Dr. Myerson testified that in his opinion plaintiff could have functioned in his job as a C.T. technician that day. *Id.* at 12. Accordingly, the court finds that plaintiff's scheduled appointment with Dr. Myerson was a routine appointment and not an emergency.

Based on the circumstances surrounding plaintiff's absence, Ms. Tipton directed that plaintiff's time card be removed from its customary location in the radiology department. Ms. Tipton left a message for plaintiff that he was to go directly to the personnel department upon his return to work on February 6, 1995. When plaintiff returned to work on February 6, he reported to the personnel department and was informed that he was being suspended until Wednesday, February 8, 1995, pending an investigation into the circumstances surrounding his absence. Ms. Tipton gave no reason for plaintiff's suspension to the plaintiff at this time.

Later on February 6, plaintiff's wife came by Fannin Hospital to pick up her husband's paycheck. During the course of her visit, Mrs. Kaylor had a conversation with an employee in the radiology department, Ms. Colleen Runyon. Mrs. Kaylor, visibly upset, asked Ms. Runyon, "What the hell is going

on? Did [Ms. Runyon] know they had suspended [plaintiff]?" Mrs. Kaylor further stated to Ms. Runyon that if plaintiff "committed suicide over losing his job she would 'beat the fucking shit out of Sue [Patterson].'" In addition, plaintiff's daughter made a call to Ms. Chesser, secretary for the radiology department, inquiring whether "that bitch was going to fire [her] daddy." Ms. Patterson interpreted these statements as a threat to her safety and contacted the Fannin County Sheriff's Department.

On February 6 and 7, Fannin management performed an investigation of plaintiff's absence. Fannin management learned of plaintiff's statements regarding his intention to miss work regardless of Ms. Patterson's approval. Fannin management concluded that plaintiff had lied in regard to his illness on February 3 and never had any intention of showing up for work, despite his assurances he would be present. Fannin management also learned of the comments made by Mr. Kaylor's wife and daughter.

On Wednesday, February 8, 1995, plaintiff returned to Fannin Hospital for the meeting as instructed. Attending the meeting were plaintiff, Ms. Tipton, and Mr. Marvin Stern, the hospital administrator. Plaintiff was told he was terminated for abuse of sick time. Plaintiff was given an opportunity to explain his absence and he stated he was sick with a stomach virus. Plaintiff requested that his time cards be pulled and his sick hours computed. Ms. Tipton did so, specifically highlighting the hours plaintiff had taken on FMLA and noting that these hours were not held against plaintiff. After the meeting, plaintiff later produced a certificate that he was at Dr. Myerson's office on February 3, but the evidence does not indicate when he gave this certificate to hospital personnel. Plaintiff's separation papers[4] filed with the Georgia Department of Labor state that he

was terminated for his "abuse of sick leave."[5]

### Conclusions of Law

Among the findings prompting The Family Medical and Leave Act was Congress's belief that "there · is inadequate job security for employees who have serious health conditions that prevent them from working for temporary periods." 29 U.S.C. § 2601(a)(4). Accordingly, the twin purposes of the FMLA are to "balance the demands of the workplace with the needs of families" and "entitle employees to take reasonable leave for medical reasons." 29 U.S.C. § 2601(b)(1) & (2). The FMLA, however, also seeks to accomplish such purposes "in a manner that accommodates the legitimate interest of employers." 29 U.S.C. § 2601(b)(3); *see also* 29 C.F.R. § 825.101(b) ("The enactment of the FMLA was predicated on two fundamental concerns—the needs of the American workforce, and the development of high-performance organizations."). The case before the court illustrates the tensions that can arise when balancing employee rights to medical leave under the FMLA with legitimate employer concerns.

The FMLA is a hybrid act; first it creates a series of statutory rights for an employee which "shall be unlawful" for the employer to violate, then it also provides protection in the event an individual is discriminated against for utilizing those rights. *See generally*, 29 U.S.C. 2615(a)(1) & (2); Nancy Daspit, Comment, *Family Medical Leave Act of 1993: A Great Idea but a "Rube Goldberg" Solution?*, 43 Emory L.J. 1351 (Fall, 1994). In addition, the Department of Labor has promulgated extensive regulations regulating the FMLA's implementation in the workplace. *See* 29 C.F.R. §§ 825.100–800, 60 F.R. 2237, Jan. 6, 1995.

The FMLA applies to private sector employers of fifty (50) or more employees and provides eligible employees up to twelve (12)

---

**4.** Plaintiff's separation paper also states "Review of past record shows excessive use of sick time." As discussed below, the court does not find this language determinative.

**5.** Plaintiff asserts that a letter from Ms. Tipton to Lesley Wright of the Wright Rehabilitation Service which states that plaintiff was fired pursuant

to its "excessive sick time" policy is proof that plaintiff was fired because of excessive FMLA leave. The court does not find this proof credible, as discussed below, especially since it is unclear that Ms. Tipton was under any duty to divulge to Ms. Wright why plaintiff was terminated.

weeks of unpaid leave per year in which to recover from a serious health condition or to care for a close family member with such a condition. 29 U.S.C. §§ 2601 et seq.; see also 29 C.F.R. § 825.114 (defining "serious health condition"). The FMLA also provides for "intermittent" leave, which allows an employee leave to attend appointments with a health provider for necessary treatment of a serious health condition. 29 U.S.C. § 2612; see also 29 C.F.R. § 825.117 (defining requirements for intermittent leave). If an employer denies an eligible employee the same or similar employment upon returning from FMLA leave, the employer violates the Act, 29 U.S.C. § 2615(a)(1), and is subject to a claim for compensatory damages and, unless the court finds the violation occurred in good faith, additional liquidated damages. 29 U.S.C. § 2617(a)(1)(A). An employee may be "eligible" for FMLA leave if he has worked for a covered employer for at least 1,250 hours in the preceding twelve months. 29 U.S.C. § 2612. The parties have stipulated that plaintiff is an eligible employee and that Fannin Hospital is a covered employer under the provisions of the Family and Medical Leave Act, 29 U.S.C. §§ 2601–2619.

This case concerns two alleged violations of the FMLA: 1) that plaintiff was denied the right to attend intermittent treatment by his health provider, and 2) that plaintiff was terminated because of prior valid use of FMLA leave. The court will consider each in turn.

I. Plaintiff's Doctor's Appointment on February 3, 1995.

■  Plaintiff's first cause of action is properly brought under 29 U.S.C. § 2615(a)(1). Plaintiff asserts that Fannin Hospital violated his rights under the FMLA by denying him a day off on February 3, 1995, in order to see Dr. Myerson for back treatment. Plaintiff asserts his doctor's appointment was valid intermittent leave pursuant to a "serious health condition."

■  The legislative history of the FMLA is silent regarding the proper legal standard to be used when reviewing FMLA claims

under 29 U.S.C. § 2612(a)(1). The plain meaning of "shall be unlawful" as used in the text of § 2615(a)(1),[6] however, strongly suggests a strict liability standard applies for any "denial" or "attempt to [deny]" the exercise of a right provided under the FMLA. 29 U.S.C. § 2612(a)(1). When a statute uses mandatory language, such as "shall" rather than "may," the Supreme Court has interpreted the statute to exclude discretion to take account of equitable or policy factors, in this case the *mens rea* of the defendant when allegedly denying plaintiff valid FMLA intermittent leave. *See Escondido Mut. Water Co. v. La Jolla Indians,* 466 U.S. 765, 772, 104 S.Ct. 2105, 2110, 80 L.Ed.2d 753 (1984) (finding since it is "generally assumed" that Congress expresses its purposes through the ordinary meaning of the words it chooses, "[a]bsent a clearly expressed legislative intention to the contrary, [statutory] language must ordinarily be regarded as conclusive") (*citing North Dakota v. United States,* 460 U.S. 300, 312, 103 S.Ct. 1095, 1102, 75 L.Ed.2d 77 (1983)). Similarly, the use of "shall be unlawful" suggests that any employer who violates § 2615(a)(1) of the FMLA is strictly liable, regardless of the intent of its actions.

The FMLA read as a whole further supports a strict liability standard. *See King v. St. Vincent's Hospital,* 502 U.S. 215, 221, 112 S.Ct. 570, 574, 116 L.Ed.2d 578 (1991) (stating that it is a "cardinal rule" that statutes are to be read as a whole, since the meaning of statutory language depends on context) (*citing Massachusetts v. Morash,* 490 U.S. 107, 115, 109 S.Ct. 1668, 1673, 104 L.Ed.2d 98 (1989)). The purpose of the lack of any language addressing the intent of the employer to violate the FMLA in § 2615(a)(1) is made clear by 29 U.S.C. § 2617's liquidated damages provisions for "good faith" violations. *See* S.Rep. 103–3, 103rd Cong., 1st Sess. 3 (1993), *reprinted in* 1993 U.S.C.C.A.N. 3, 5 ("However, if the employer proves to the satisfaction of the court that it acted in good faith and had reasonable grounds to believe that its acts or omissions were not a violation, the court may, in its

---

**6.** "It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1).

discretion, limit the employer's liability to the actual damages."). The presence of a reduced damage option for courts who find a defendant acted unintentionally or violated the FMLA in "good faith" means that even unintentional violators are still liable and thus supports a strict liability approach for 29 U.S.C. § 2612(a)(1).

Finally, the legislative history of the Act evinces Congress's intent to implement the FMLA as a successor to federal labor laws establishing minimum standards for employment:

> The Family and Medical Leave Act (FMLA) accommodates the important societal interest in assisting families, by establishing a minimum labor standard for leave. The bill is based on the same principle as the child labor laws, the minimum wage, Social Security, the safety and health laws, the pension and welfare benefit laws, and other labor laws that establish minimum standards for employment.

S.Rep. No. 103–3 at 6, U.S.C.C.A.N. at 7.

Accordingly, by establishing a "minimum standard" for employee leave, Congress apparently intended for FMLA leave protected by § 2612(a)(1) to be strictly enforced with any question of an employer's intent to violate the FMLA to be considered only when assessing damages.

█ Accordingly, the court will look solely to the FMLA to determine whether Fannin Hospital has abridged plaintiff's FMLA leave rights under 29 U.S.C. § 2615(a)(1) and will not inquire into the subjective intent of Fannin Hospital when it allegedly violated the FMLA. This strict liability standard, however, does not ease the burden on the plaintiff. Plaintiff must still demonstrate that he possesses a statutory right, created affirmatively by the provisions of the FMLA, that has been violated.

In order to be granted intermittent leave under the FMLA, an employee must pass through a series of substantive requirements and procedural hoops as provided by the statute. These statutory requirements and procedures include:

1) the leave must be "medically necessary," for a "serious health condition," 29 U.S.C. § 2612(b)(1);

2) the employee must make a reasonable effort to schedule the treatment so as not to "disrupt unduly the operations of the employer," 29 U.S.C. § 2612(e)(2)(A); and

3) the employee must give at least thirty (30) days notice to the employer, 29 U.S.C. § 2612(e)(2)(B).

Plaintiff failed to satisfy these conditions adequately in order to qualify for intermittent leave on February 3, 1995, and therefore fails to establish that his FMLA rights have been violated under 29 U.S.C. § 2615(a)(1).[7]

█ When enacting the FMLA, Congress contemplated that intermittent leave would be available only when medically necessary for a serious health condition. *See* H.R.Rep. No. 8, 103d Cong., 1st Sess. Pt. 1, at 58 (1993). In the FMLA's legislative history, the Senate committee report listed the following as examples of "serious health conditions": "[B]ack conditions requiring extensive therapy or surgical procedures ... spinal injuries ... injuries caused by serious accidents on or off the job." S.Rep. No. 103–3 at 29, 1993 U.S.C.C.A.N. at 31. In addition, 29 C.F.R. § 825.114 defines a chronic serious health condition as an "illness, injury, impairment, or physical or mental condition" that involves a "period of incapacity" of over three (3) days, 29 C.F.R. § 825.114(a)(2), and any subsequent treatment that involves "[requiring] periodic visits for treatment by a health care provider." 29 C.F.R. § 825.114(a)(2)(iii)(A). Plaintiff was incapacitated for three weeks due to his back injury in late 1994 and early 1995. He attends regularly scheduled appointments with a health care provider for treatment of that condition. Accordingly, the plaintiff's

---

**7.** Section 29 U.S.C. § 2613(b)(5) also requires that the employee shall provide timely certification of the intermittent leave signed by the health provider, upon request of the employer, including "the dates on which such treatment is expected to be given and the duration of such treatment." 29 U.S.C. § 2613(b)(5); *see* S.Rep. No. 103–3, at 25–26, U.S.C.C.A.N. at 27–28 (certification requirement "designed as a check against employee abuse of leave"). As Fannin Hospital never requested such certification, the court does not address this provision of the FMLA.

**998**

degenerative back condition qualifies as a "serious health condition."

■ Whether plaintiff satisfied the requirement that his appointment on February 3 was "medically necessary" is arguable, however. *See* 29 C.F.R. § 825.117 ("For intermittent leave ... there must be a medical need for leave (as distinguished from voluntary treatments and procedures)"). Dr. Myerson testified affirmatively that plaintiff's visit was not an "emergency" visit as suggested by plaintiff. Deposition of Dr. Myerson, Joint Exhibit 20, at 21. While Dr. Myerson stated that plaintiff's visit was needed in order to renew prescriptions and "make sure nothing else was going on," the visit was not noted in Dr. Myerson's certificate of fitness to return to work, and it appears plaintiff's visit was "routine" with February 3, 1995, holding no special medical significance. *Id.* at 14. Moreover, Dr. Myerson believed that plaintiff would have been able to "function in his job" that day. *Id.* at 12. Finally, the fact that plaintiff waited so late to inform his supervisor of the appointment underscores the doubt this court has as to whether the February 3, 1995, appointment was "medically necessary." Nevertheless, it is plaintiff's failure to adhere to the FMLA procedures for informing his employer of the intermittent leave that is ultimately fatal to his claim.

The FMLA and subsequent regulations promulgated by the Department of Labor require the employee to consult with the employer when planning medical treatment. The employee must also make a "reasonable effort" to reschedule when an appointment may "disrupt unduly" the employer's operations, subject to the approval of the health care provider. 29 U.S.C. § 2613(e)(2)(A); *see also* 29 C.F.R. § 825.117 ("Employees needing intermittent FMLA leave or leave on a reduced leave schedule *must* attempt to schedule their leave so as not to disrupt the employer's operations.") (emphasis added). Both the text of the FMLA and its legislative history indicate that the cooperation of the employee and employer in scheduling intermittent leave is vital in implementing the goals of the FMLA. *See* 29 U.S.C. § 2601(b)(3) (FMLA goals should be imple-

mented "in a manner that accommodates the legitimate interest of employers"); S.Rep. No. 103–3 at 26, 1993 U.S.C.C.A.N. at 28 ("Leave taken under [the FMLA] may not be taken intermittently or on a reduced leave schedule, unless the employee and the employer agree to such an arrangement.").

The court finds the plaintiff never reasonably attempted to reschedule his appointment after being told his absence on February 3, 1995, would leave Fannin Hospital without adequate staffing in the radiology department. There is no evidence that plaintiff contacted Dr. Myerson about rescheduling. In fact, Dr. Myerson's testimony suggests that he would have been amenable to rescheduling the appointment since plaintiff's visit was routine. Although evidence is present which suggests that another appointment may not have been available until two to three months later, this situation could have been avoided had plaintiff informed his supervisor earlier, and the possibility of a later appointment does not justify not attempting to reschedule at all.

Furthermore, plaintiff's actions during the week of January 30 indicate that he never intended to make a "reasonable effort" to reschedule at all. Plaintiff continually misled his supervisor by claiming he would attend work on February 3, yet never even canceled his appointment with Dr. Myerson on that date. Plaintiff's actions indicate he intended to attend the February 3 appointment regardless of the effect upon staffing at Fannin Hospital. In contrast to the "reasonable effort" required by the FMLA, plaintiff made no effort whatsoever to cooperate with Fannin Hospital.

■ The FMLA and accompanying regulations promulgated by the Department of Labor clearly contemplate thirty (30) days notice to be given for any intermittent leave. 29 U.S.C. § 2612(e)(2)(B), 29 C.F.R. § 825.302(a). Plaintiff knew of the appointment since at least November, but waited until January 30, 1995, to inform his supervisor. The court finds no reasonable excuse exists for this delay. Plaintiff had full knowledge of the appointment, nothing suggests the appointment date was unreliable and thus warranted not revealing the appoint-

ment, nor did plaintiff lack the opportunity to inform his supervisor of the appointment. Plaintiff simply waited until four days before the appointment before requesting the day off. Accordingly, he failed to fulfill his employee obligation under the FMLA for intermittent leave.

■ Plaintiff testified at trial that he "never knew of the FMLA" and suggests a lack of employer notice as an excuse for his failure to follow FMLA procedure. *See* 29 C.F.R. § 825.304(c). Plaintiff's argument is without merit. As set forth in the finding of facts, Fannin Hospital provided notice of the FMLA by posting a notice of the FMLA provisions in the employee break room, it discussed the FMLA in its Employee Handbook, and discussed the FMLA during its Risk Management sessions for employees. During plaintiff's previous FMLA leave in December, 1994, he received further information on the FMLA. In addition, plaintiff offers no excuse for his failure to follow Fannin Hospital's practice of filing a written leave request form at least two weeks before the requested leave. Accordingly, Fannin Hospital has satisfied the employer notice requirements promulgated by the Department of Labor. *See* 29 C.F.R. §§ 825.300–301.

■ Finally, plaintiff's argument that he was entitled to "unforeseeable" FMLA leave is unpersuasive. Plaintiff's "stomach virus" cannot be "unforeseeable" FMLA leave because a stomach virus is not a serious health condition covered by the FMLA. 29 C.F.R. 825.114(c). Furthermore, as discussed above, plaintiff's visit to Dr. Myerson for his degenerative back disease was not an emergency. Plaintiff had this appointment since November, 1994, he never canceled the appointment, and Dr. Myerson considered the appointment "routine."

Under 29 C.F.R. § 825.304(b), if an employee fails to give the requisite notice for foreseeable leave with no reasonable excuse for the delay, the employer may delay taking of FMLA leave for thirty (30) days after the date the employee provides notice of FMLA leave. 29 C.F.R. § 825.304(b) Fannin Hospital has complied with its notice requirements under the FMLA. Plaintiff has not. Like-

wise, plaintiff has also failed to establish that he possessed a valid FMLA statutory right to intermittent leave for his February 3 appointment with Dr. Myerson.

■ An employee returning from FMLA leave is not entitled to greater rights than he had prior to leave. 29 U.S.C. § 2614(a)(3)(B). The FMLA also *does not* give employees the unfettered right to take time off subject only to their own convenience without any consideration of its effect upon the employer. Accordingly, the court finds that Fannin Hospital did not violate the FMLA by denying plaintiff the day off on February 3, 1995, after receiving only four (4) days notice of his doctor's appointment.

II. Plaintiff's Termination on February 8, 1995.

Plaintiff's second cause of action falls under § 2615(a)(2). Complementing § 2615(a)(1), subsection (a)(2) prohibits discrimination against any employee who attempts to exercise his rights under the FMLA. Plaintiff claims that he was terminated either in retaliation for his previous exercise of valid FMLA leave or because his absence on his final day of work was protected by the FMLA.

■ Unlike § 2615(a)(1), the legislative history on the legal standard Congress intended to be applicable to § 2615(a)(2) is relatively clear. Congress clearly contemplated that the proper framework for analyzing a retaliation claim based on circumstantial evidence under § 2615(a)(2) of the FMLA is the shifting burdens of proof analysis first established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973):

> Section 105(a)(2) makes it also unlawful for an employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this title. This "opposition" clause is derived from title VII of the Civil Rights Act of 1964 (42 U.S.C. 2000e–3(a)) and is intended to be construed in the same manner....

Title VII's opposition clause "forbids discrimination against applicants or employees for attempting to protest or correct allegedly discriminatory conditions of employment."

S.Rep. No. 103–3 at 34, 1993 U.S.C.C.A.N. at 36 (*quoting McDonnell Douglas,* 411 U.S. at 796, 93 S.Ct. at 1821). *See also Oswalt v. Sara Lee Corp.,* 889 F.Supp. 253, 259 (D.Miss.1995), *aff'd,* 74 F.3d 91 (1996); *McCown v. UOP, Inc.,* 2 Wage & Hour Cases 2d (BNA) 1669, 1995 WL 519818 (N.D.Ill. 1995).

The language of the FMLA makes plain the purpose of Congress to assure equality of employment opportunities for those individuals who assert their rights under the FMLA. The burden shifting approach best effectuates the intent of the FMLA to prohibit discrimination against employees using FMLA leave because it can most accurately balance providing employees a broader basis for proving an employer violated the FMLA while also protecting the interests of employers. *See McDonnell Douglas,* 411 U.S. at 792, 93 S.Ct. at 1817 ("The broad, overriding interest, shared by employer, employee, and consumer, is efficient and trustworthy workmanship assured through fair and racially neutral employment and personnel decisions."). The burden shifting approach also places claims of FMLA discrimination under the well settled rubric of law governing discrimination claims under Title VII, the ADEA, etc., and thus ensures uniformity in analyzing discrimination in the workplace.

In a claim brought pursuant to the FMLA, the plaintiff bears the ultimate burden of proving that FMLA leave was the determinative factor in the employment decision at issue. 29 U.S.C. § 2615(a)(2); *Oswalt,* 889 F.Supp. at 259; *see also Verbraeken v. Westinghouse Electric Corp.,* 881 F.2d 1041, 1045 (11th Cir.1989), *cert. dismissed,* 493 U.S. 1064, 110 S.Ct. 884, 107 L.Ed.2d 1012 (1990) (age discrimination claim). Consistent with the framework set forth in *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), for employment discrimination litigation, a typical FMLA discrimination case may involve three phases: (1) the plaintiff must establish a prima facie case of FMLA discrimination; (2) the burden of *production* then shifts to the defendant to show a legitimate nondiscriminatory reason for the challenged employment action; and (3) the plaintiff, in order to prevail, must present evidence to show that the defendant's proffered reason is merely pretextual. It is critical to realize that the ultimate burden of persuasion, at all times, remains with the plaintiff. *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 507, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993) (race discrimination claim).

There are three methods by which an FMLA plaintiff may establish a *prima facie* case of FMLA discrimination: by direct evidence of discriminatory intent; by circumstantial evidence of discriminatory intent through the use of the paradigm postulated in *McDonnell Douglas;* or by establishing a pattern of discrimination through the use of statistical evidence. *Hazelwood School District v. United States,* 433 U.S. 299, 307–08, 97 S.Ct. 2736, 2741–42, 53 L.Ed.2d 768 (1977) ("Where gross statistical disparities can be shown, they alone in a proper case constitute *prima facie* proof of a pattern or practice of discrimination.").

The easiest of these, from a plaintiff's perspective, is the use of direct evidence. Thus, if an employer states, "[Y]ou are fired because you used FMLA leave," the discharged employee may use that statement to establish a prima facie case of FMLA discrimination. "[O]nly the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of age, ... constitute direct evidence of discrimination." *Earley,* 907 F.2d at 1081 (*quoting Carter v. City of Miami,* 870 F.2d 578, 582 (11th Cir. 1989) (alterations in original)). Accordingly, only the most blatant remarks which evince the intent to discriminate against individuals who invoke their FMLA rights can constitute direct evidence of FMLA discrimination.

The second method of establishing a *prima facie* case is through the use of circumstantial evidence as set forth originally in

the *McDonnell Douglas* case.[8] In the current context, a plaintiff must show that he: (1) availed himself of a protected right under the FMLA; (2) was adversely affected by an employment decision; (3) there is a causal connection between the protected activity and the adverse employment action; and (4) he was qualified for his position at the time of the adverse employment action. *Cf. Stanfield v. Answering Service, Inc.*, 867 F.2d 1290, 1293 (11th Cir.1989) (age discrimination claim).

The third method by which a plaintiff may establish a *prima face* case of FMLA discrimination is through the use of statistical evidence. *See Pace v. Southern Ry. Sys.*, 701 F.2d 1383 (11th Cir.), *cert. denied*, 464 U.S. 1018, 104 S.Ct. 549, 78 L.Ed.2d 724 (1983) (age discrimination claim). "If a plaintiff seeks to rely on proof of a pattern of discrimination ... he has the burden of presenting such statistical evidence that will, in conjunction with the other [*McDonnell Douglas*] elements, give rise to an inference of discrimination." *Id.* at 1388.[9] The Eleventh Circuit has held that even if statistics can be used to establish a pattern of discrimination against a class of individuals, the individual plaintiff must still be able to demonstrate that the adverse employment action directed against him was a result of such discrimination. *Carmichael v. Birmingham Saw Works*, 738 F.2d 1126, 1131 (11th Cir.1984) (discussing statistics in Title VII race discrimination claims).

Once the plaintiff has established a *prima facie* case—regardless of which method is used—the employer/defendant must come forward with a legitimate nondiscriminatory reason to justify the employment de-cision. This is not a shift in the burden of persuasion but simply requires the employer to present evidence to explain its actions. If successful, the employer defeats the presumption of intentional discrimination created by the *prima facie* case. *See St. Mary's Honor Center*, 509 U.S. at 507, 113 S.Ct. at 2747.

Once the presumption of intentional discrimination is defeated, the plaintiff bears the burden of producing evidence to show that the articulated legitimate nondiscriminatory reason is merely a pretext for discrimination. *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095. Notwithstanding the shift in the burden of production subsequent to the plaintiff's presentation of a *prima facie* case, the plaintiff retains the ultimate burden of persuasion on the question of whether discrimination occurred. *St. Mary's Honor Center*, 509 U.S. at 507, 113 S.Ct. at 2747.

Having established a legal framework in which to analyze the allegation of unlawful FMLA discrimination, the court now proceeds to the case *sub judice*. Plaintiff has presented neither direct evidence [10] nor statistical evidence of FMLA discrimination, and therefore the court will proceed directly to the *McDonnell Douglas* burden shifting analysis.

Plaintiff asserts he was terminated pursuant to a "no-fault" policy which terminated any employee who had an "excessive" number of absences. Plaintiff claims that Fannin Hospital counted his FMLA leave toward the excessive absences, thus violating the FMLA. In the alternative, plaintiff claims that he was terminated because he justifiably exercised his FMLA right to intermittent leave on February 3, 1995, and therefore Fannin

---

8. The *McDonnell Douglas* test, as formulated in the context of a Title VII hiring claim, requires the plaintiff to show: (1) that he is a member of a protected class; (2) that he applied for and was qualified for a job for which the employer was seeking applicants; (3) that despite his qualifications he was rejected; and (4) that after his rejection the position remained open and the employer continued to seek applicants of similar qualifications. 411 U.S. at 802, 93 S.Ct. at 1824.

9. A plaintiff may establish part of a *prima facie* case of FMLA discrimination in cases relying on statistical evidence by showing that workers who invoke rights under the FMLA are systematically terminated.

10. Plaintiff's direct evidence of discrimination is unpersuasive because it is not the blatant "smoking gun" required by the Eleventh Circuit. *See Earley*, 907 F.2d at 1081. Plaintiff's evidence asks this court to draw inferences from the facts and is thus more properly analyzed as circumstantial evidence. *See Mize v. Jefferson City Board of Education*, 93 F.3d 739, 742–44 (11th Cir.1996) (discussing distinction between direct and circumstantial evidence).

Hospital violated the FMLA by firing him in retaliation. Neither of plaintiff's arguments is persuasive.

Plaintiff fails to establish a *prima facie* case of FMLA discrimination for "excessive absenteeism." No evidence credibly suggests that Fannin Hospital terminated plaintiff's employment because of plaintiff's three week FMLA leave in late 1994 and early 1995. To the contrary, testimony at trial showed that Fannin Hospital provided FMLA leave promptly to plaintiff after he experienced problems with his back and has shown great flexibility with plaintiff concerning his physical limitations. Testimony concerning Fannin Hospital's past practice regarding FMLA leave to other employees also showed an unwavering pattern of compliance with the FMLA. There is no evidence to suggest plaintiff's prior FMLA leave was a motivating factor in Fannin Hospital's decision to discharge plaintiff.

Plaintiff points to isolated documents which state that plaintiff was terminated in part because of "excessive use of sick time." Plaintiff's focus on isolated instances of Fannin Hospital's use of the word "excessive" is unpersuasive in light of the overwhelming evidence that plaintiff was discharged for lying and misleading Fannin Hospital about his job attendance. First, plaintiff presented no credible evidence besides conclusory allegations that Fannin Hospital used a "no-fault" policy on excessive absenteeism. Second, plaintiff still had sick leave "coming to him" at the time of his discharge, undercutting any notion that plaintiff was terminated pursuant to a "no-fault" policy. Third, "excessive use of sick time" is a standard generic phrase which could apply to any number of actions, including attempting fraudulent sick leave. Moreover, all of plaintiff's documents are consistent with "abuse of sick time" as the reason for plaintiff's termination.

As to plaintiff's allegation that plaintiff was discharged in retaliation for taking intermittent leave on February 3, plaintiff has failed to show Fannin Hospital discriminated in violation of the FMLA. As discussed above, plaintiff's appointment on February 3 was not valid intermittent leave, nor was it valid "unforeseeable" leave. Accordingly, Fannin Hospital could not discriminate against FMLA leave that never occurred.

Moreover, even if plaintiff established a *prima facie* case, Fannin Hospital has produced a legitimate and non-discriminatory reason for plaintiff's discharge. Fannin Hospital believed plaintiff lied about being sick and never intended to be at work on February 3, 1995. In addition, the actions of plaintiff's family on February 6, 1995 contributed to the "general feeling" that plaintiff should be terminated.

Whether Fannin Hospital is correct that plaintiff lied or his family made credible threats concerning Ms. Patterson is irrelevant. Perhaps, as plaintiff testified at trial, plaintiff was sick the morning of February 3, the vomiting aggravated his back, he fortuitously did not cancel his appointment, his daughter fortuitously could pick him up at 6:45 a.m. and drive him to Dr. Myerson's office, Dr. Myerson simply forgot to mark down plaintiff's virus on his medical sheet, Dr. Myerson was wrong that the visit was "routine," plaintiff always intended to go to work on February 3, and consequently Fannin Hospital's rush to judgment was in error. Perhaps Ms. Patterson and Fannin Hospital overreacted to the statements made by plaintiff's family and Ms. Patterson's call to the local police was not warranted. The wisdom of discharging plaintiff, however, is irrelevant to plaintiff's claim. Defendant's explanation is not related to FMLA discrimination and therefore satisfies the second prong of the *McDonnell Douglas* test. Fannin Hospital needs only to "produce" an explanation, not justify it. *See Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094 ("[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons.").

Having produced the nondiscriminatory reason for discharge, plaintiff must produce sufficient evidence to establish pretext. No credible evidence suggests Fannin Hospital's reason for discharging plaintiff is pretextual. To the contrary, as discussed throughout this opinion, the overwhelming evidence supports Fannin Hospital's claim it discharged plaintiff because of plaintiff's lying and misleading

Ms. Patterson concerning his presence at work on February 3, 1995.

In the present case, the plaintiff has failed to prove his discharge was motivated by his valid FMLA leave for his initial back surgery, or to show the proffered reason for his discharge is pretext for an improper motive. Accordingly, plaintiff has failed to establish that Fannin Hospital violated his rights pursuant to the FMLA.

### Conclusion

Accordingly, based upon the foregoing discussion, the court finds that Fannin Hospital did not violate the FMLA and hereby renders judgment in favor of the defendant. The clerk shall enter judgment accordingly.