Marvin L. WILLIAMS, Plaintiff,

v.

SHENANGO, INC., Defendant.

No. CIV. A. 96–155.

United States District Court,
W.D. Pennsylvania.

March 31, 1997.

---

Timothy P. O'Brien, Pittsburgh, PA, for plaintiff.

Jane Howard–Martin, Priscilla L. Hapner, Kirkpatrick & Lockhart, Pittsburgh, PA, for defendant.

**OPINION** and **ORDER OF COURT**

AMBROSE, District Judge.

Plaintiff Marvin L. Williams ("Williams") filed a three count Complaint seeking compensation under the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq.* ("FMLA"), and the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981. Williams contends that his former employer, Defendant Shenango, Inc. ("Shenango") interfered with his attempt to take leave under the FMLA; retaliated against him for having taken leave pursuant to the FMLA; and discriminated against him because of his race. Williams is an African–American.

Currently pending is Shenango's Motion for Summary Judgment (Docket No. 9). Shenango claims that Williams' § 1981 claim is deficient because: (1) white employees who committed similar infractions were similarly treated; (2) Shenango's reasons for disciplining and discharging Williams were legitimate; and (3) Williams cannot show that Shenango's reasons for its actions were pretextual. Shenango similarly attacks Williams' FMLA claims as deficient because: (1) Williams was not needed to care for a family member with a serious health condition and therefore is not protected by the FMLA; (2) Williams received the leave to which he was entitled; (3) Williams was not disciplined as a result of taking FMLA leave; and (4) Williams cannot show that Shenango's reasons for disciplining and discharging him were pretextual.

After careful consideration, and for the reasons set forth below, Shenango's Motion for Summary Judgment is granted in part and denied in part. Specifically, Shenango's Motion for Summary Judgment is denied with respect to Counts I and II, and granted with respect to Count III.

### STANDARD FOR SUMMARY JUDGMENT

Summary judgment may only be granted if the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show that there is no genuine issue as to any material facts and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Rule 56 mandates the entry of summary judgment, after adequate time for discovery, and upon motion, against the party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2551, 91 L.Ed.2d 265 (1986).

In considering a motion for summary judgment, the Court must examine the facts in a light most favorable to the party opposing the motion. *International Raw Materials, Ltd. v. Stauffer Chemical Co.,* 898 F.2d 946, 949 (3d Cir.1990). The burden is on the moving party to demonstrate that the evidence creates no genuine issue of material fact. *Chipollini v. Spencer Gifts, Inc.,* 814 F.2d 893, 896 (3d Cir.1987), *cert. denied,* 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987). The dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (3d Cir.1986). A fact is material when it might affect the outcome of the suit under the governing law. *Id.* Where the nonmoving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the nonmovant's burden of proof at trial. *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2551. Once the moving party satisfies this burden, the burden shifts to the nonmoving party, who must go beyond its pleadings, and designate specific facts by use of affidavits, depositions, admissions, or answers to interrogatories showing that there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. at 2553.

Summary judgment must therefore be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *White v. Westinghouse Electric Co.,* 862 F.2d 56, 59 (3d Cir.1988),

*quoting, Celotex,* 477 U.S. at 322, 106 S.Ct. at 2551.

### FACTUAL BACKGROUND

Prior to his discharge, Williams had worked for Shenango, most recently as a loader helper, for approximately 22 years. In July of 1994, Williams' wife was hospitalized for abdominal surgery and required a period of hospitalization and lengthy recovery period at home. Sometime prior to her surgery, Williams informed his supervisor that he would need time off in the near future as a result of the surgery.

At or about the time of the surgery, Williams requested a week's absence. Williams' request was denied and he was offered the option of taking a different week off. Williams refused the option and instead called off for the week of July 21, 1994. Although Shenango initially treated Williams' absences as unauthorized, it later dropped these charges after learning that they were authorized under the FMLA.

On August 25, 1994, Williams received a four day suspension stemming from excessive absenteeism and leaving without relief.[1] Williams does not contest the fact that he left before his relief arrived. Nevertheless, he claims that these early departures were necessitated by his wife's surgery, and that Shenango was aware of this fact.[2]

Williams then received a five-day suspension subject to discharge in September 1994. The suspension was predicated upon Williams having again left without relief, this time on September 23, 1994. Williams concedes that he left without relief, but again characterizes his actions as necessitated by his wife's surgery.

After receipt of the five-day suspension, Williams and Shenango executed a Last Chance Agreement. Shenango explained that a Last Chance Agreement is a disciplinary technique used in lieu of discharge. An Agreement of this nature typically allows an employee who could otherwise be discharged for one or more infractions to keep his job on the condition that he will not violate other rules within a certain period of time. Williams' Agreement gave Shenango the unilateral right to terminate his employment for any additional infractions.

On January 4, 1995, Williams failed to call off and failed to report at work as scheduled. At a disciplinary hearing on January 6, 1995, Williams told the then-assistant superintendent of coke operations that his mother had had a heart attack and been hospitalized. Although Cumer informed Williams that he would seek to verify the story, Williams did not recant. After learning that Cumer had unsuccessfully attempted to verify the story, Williams promised he would obtain a doctor's excuse. When Williams had not provided an excuse by January 12, 1995, he was issued a five-day suspension subject to discharge. At the January 16, 1995 hearing, Williams admitted that he had lied, and that he had simply overslept on the day in question. Shenango then converted the suspension to a discharge because the "no report/no show" on January 4th without adequate excuse violated the Last Chance Agreement.

### ANALYSIS

### I. COUNT III— *§ 1981 VIOLATIONS*

In Count III of his Complaint, Williams avers that similarly situated white employees at Shenango were treated more favorably than he, an African American. Specifically, Williams alleges that such employees were not suspended and/or terminated for conduct similar to or identical to the conduct for which he was suspended and ultimately discharged. Section 1981 provides, in relevant part:

1. Shenango uses a progressive disciplinary policy consisting of a written warning, a three day suspension and a five day suspension subject to discharge. A five day suspension subject to discharge may be converted to a discharge if the facts so warrant at a disciplinary hearing immediately following the suspension. Under the collective bargaining agreement, violations more than 12 months old are not considered in determining the level of discipline to be imposed.

2. Williams had previously received a written warning on November 12, 1993 for failure to punch his time card, and a three day suspension on January 22, 1994 for insubordination.

[a]ll persons within the jurisdiction of the United States shall have the same right in every State ... to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other. 42 U.S.C. § 1981(a). The phrase "making and enforcing contracts" is defined to include "the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b).

▪ To survive a motion for summary judgment, a plaintiff must show that there is a material issue of fact from which an inference of disparate treatment based on race may be drawn. A plaintiff may accomplish this "by direct evidence of a racially discriminatory animus on the part of the employer, or if he is a member of a protected class, by the indirect burden shifting scheme established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)...." *Miller v. Yellow Freight Systems, Inc.*, 758 F.Supp. 1074, 1077 (W.D.Pa. 1991), *aff'd*, 941 F.2d 1202 (3d Cir.1991).

▪ Here, Shenango alleges that the record is devoid of any direct evidence of racial animus, and that Williams must therefore prove his case through the burden shifting scheme. (Docket No. 10, p. 11). Under the *McDonnell Douglas* standard, Williams must show: (1) that he belongs to a protected class; (2) that he was qualified for his former job; (3) that he was discharged; and (4) that other persons not in a protected class who were guilty of the same work infractions were not discharged. *Miller*, 758 F.Supp. at 1077. Once Williams has established his *prima facie* case, the burden of production then shifts to Shenango to articulate a legitimate nondiscriminatory reason for the discharge. *Sheridan v. E.I. DuPont de Nemours and Co.*, 100 F.3d 1061, 1065–67 (3d Cir.1996). If Shenango is able to articulate such reasons, the burden of production then shifts to Williams, who must "cast sufficient doubt

upon the employer's proffered reasons to permit a reasonable factfinder to conclude that the reasons are incredible...." *Sheridan*, 100 F.3d at 1072. Although the burden of production shifts throughout the analysis, the ultimate burden of persuasion always remains with Williams.

Shenango challenges Williams' ability to prove a *prima facie* case only with respect to the fourth element—establishing a disparity of treatment. In the alternative, Shenango offers various reasons, which it characterizes as legitimate and nondiscriminatory, for disciplining Williams, and contends that the record is devoid of any evidence that such reasons are pretext.

*(A). Disparate Treatment*

According to Shenango, "there is no evidence in this case that any employee with a disciplinary history as rich as Williams' was not similarly disciplined through the progressive stages." (Docket No. 10, p. 14). Williams counters that the very documents upon which Shenango relies to prove Williams' infractions establish disparity of treatment. Specifically, Williams looks to three types of infractions by employees: (1) early departure; (2) excessive absenteeism; and (3) insubordination. Williams also claims that, unlike African American employees, white employees are not required to work double shifts.

*(1). Early departure.*

Williams submitted a chart in support of his contention that white employees who leave before the arrival of their replacements are not disciplined, as are similarly situated African American employees.[3] The chart identifies the following white employees as having left work, on a total of ten occasions, prior to the arrival of their replacement: Arthur Smith; Donald Prevendowski; Vierheller and J. Fikicz. Williams' counsel affirms in his affidavit that a review of the employee records for these individuals did not reveal any discipline for these infractions. In contrast, Williams claims (and Shenango

**3.** Williams' counsel submitted an affidavit stating that the information compiled in the chart was derived from documents produced by Shenango during discovery.

does not disagree), Williams was disciplined, in the form of a suspension, in part for this same infraction.

In response, Shenango contends that the chart is factually erroneous. Shenango explains that Williams' errors are due, in part, to his reliance upon the employee schedules, rather than the employee time sheets. Shenango submitted a "corrected chart", the accuracy of which Williams apparently does not dispute, which was based upon the employee time sheets. The chart reveals that no position went unfilled following an employee's reporting off. The chart also shows that relief workers had punched in by the start of their shifts. However, Shenango admits that the chart does indicate that certain white employees left prior to the arrival of their replacements.

Shenango urges, nevertheless, that a broader review of the record "demonstrates undisputably that Williams and other African American employees punched out before relief workers punched in on numerous occasions during the same time period and were not disciplined." (Docket No. 19, p. 3). Indeed, the record indicates that Williams himself left his position early on six occasions between May 1st and September 30, 1994, yet was not disciplined for any of these infractions. Similarly, the record indicates that Ron Lewis, also an African American, left work early, without repercussion, on numerous occasions during the same time period.

Shenango also points to instances in which certain white employees were disciplined for early departures. Daniel Cumer, the plant manager, stated in his affidavit that his review of the disciplinary record revealed that, on 27 different occasions since 1990, white employees were disciplined for leaving without relief. As an example, Cumer stated that William Stern, a white employee, received a written warning on December 5, 1994 for leaving without relief.

Thus, Shenango contends that the "whole record" reveals that all employees, both white and African American, were disciplined for early departures. Further, Shenango contends, employees, both white and African American (including Williams), escaped from

discipline for this infraction on several occasions. Shenango explains that, because this infraction is only noted through physical observation, where the replacement employee is on the job at the beginning of the shift, a supervisor may well be unaware that the previous employee had left early.

(2) Excessive absenteeism.

Williams also claims that white employees guilty of excessive absenteeism were not disciplined in the same manner as he. Despite this conclusory statement, Williams offers only the name of Arthur Smith, a white employee, as an example. According to Williams, Smith was absent from work on 14 occasions between February 1994 and January 30, 1995, and again on nine occasions between September 1995 through March 1995. Williams contends that, despite the excessive number of absences, Smith received only a warning in the way of discipline, whereas Williams was suspended.

Shenango counters that Williams misread Smith's records. According to Shenango, Smith was disciplined in a manner consistent with the same policies and procedures as was Williams. The documents submitted by Shenango reveal that Smith had nine absences, which counted towards discipline, from February 1994 through January 30, 1995, and five absences which were vacation days. Shenango claims that, when Demoise reviewed records in February 1995, Smith had exceeded the number of allowable absences and received a warning notice. In April 1996, Demoise again reviewed records and learned that Smith had nine absences between September 1995 and March 1996. Smith was again issued a written warning. Smith was not suspended, Shenango explains, because "[s]ince more than twelve months had elapsed since Smith's previous violation, he was again subject to the first step of the discipline policy." (Docket No. 19, p. 6). Thus, Shenango concludes, given that Smith had not been reprimanded for violating company rules on more than one occasion during a twelve month period, he was not similarly situated with respect to Williams. As revealed by the records, Williams was subject to discipline on more

than one occasion during a twelve month period, and thus received a more severe form of punishment.

(3) Insubordination.

Williams also claims that employees charged with "insubordination" were not similarly treated. Donald Prevendowski, Williams alleges, showed up for work drunk and shouted profanities to his supervisor. Williams' counsel attested that a review of Prevendowski's record did not reveal any discipline for this instance. In contrast, Williams points to his suspension for, in part, insubordination stemming from his refusal to select an alternative week of vacation in connection with his FMLA leave.

Shenango does not respond to this allegation concerning Prevendowski. However, Daniel Cumer attested that another white employee, Ron Sheppard, received a five-day suspension subject to and converted to discharge in August 1992 for failing to follow the directives of a supervisor.

(4) Double shifts.

Finally, Williams contends that white employees were not required to work double shifts, whereas African American employees were. Williams claims that "[a]ccording to Shenango's work rules, however, employees are supposed to remain at work for up to eighteen hours in the event that their relief is absent for any reason... As indicated [in the chart identified] above, white workers were apparently able to avoid that requirement routinely." (Docket No. 14, p. 11).

However, as already explained, Williams' chart is factually erroneous. The "corrected chart" submitted by Shenango reveals that no shift went unmanned, in violation of Shenango rules. Further, it indicates that white employees, specifically Prevendowski, did work double shifts.

■ In conclusion, when considering the evidence proffered by Williams, in conjunction with the evidence submitted by Shenango, I find that Williams has not discharged

his burden of proving disparate treatment. The record indicates that both white and African American employees were routinely disciplined for leaving work prior to the arrival of a replacement; that both white and African American employees occasionally avoided discipline for the same infraction; that both white and African American employees were disciplined for excessive absenteeism; that both white and African American employees were disciplined for insubordination; and that both white and African American employees worked double shifts. Further, although Williams identified certain white employees who committed one or more of the above-enumerated infractions and who did not receive as severe a discipline as did Williams, Williams did not identify any employee, white or African American, who had committed as many infractions as had he, within the same time frame. Finally, Williams did not identify a single white employee who lied to Shenango about an unexcused absence, and perpetuated the lie until caught. And Williams certainly did not identify any white employee who acted in such a manner while subject to a Last Chance Agreement. Consequently, I agree with Shenango that Williams did not discharge his burden of establishing a genuine issue of material fact concerning each element necessary to establish a *prima facie* case under § 1981. Shenango's Motion for Summary Judgment is therefore granted insofar as it seeks the dismissal, with prejudice, of Williams' claim in Count III of the Complaint for violations of 42 U.S.C. § 1981.[4]

## II. COUNTS I AND II—FMLA VIOLATIONS

■ In 1993, Congress enacted the FMLA "in response to demographic changes in the workplace that had negatively impacted the family's ability to care for children and ill family members." *Gudenkauf v. Stauffer Communications, Inc.*, 922 F.Supp. 465, 474 (D.Kan.1996), *citing*, 29 U.S.C. § 2601(a). "Balancing the family's needs

---

4. Given the dismissal of Count III on this basis, I need not address Shenango's other arguments supporting dismissal.

against the demands of the workplace, the Congress designed the FMLA 'to provide a security net for families by setting a minimum employment standard for unpaid leave that is required on the basis of medical necessity.'' *Gudenkauf,* 922 F.Supp. at 474, *quoting from, Johnson v. Primerica,* No., 94–4869, 1996 WL 34148 (S.D.N.Y. Jan.30, 1996).

The FMLA grants an "eligible employee" the right to twelve workweeks of leave, over any period of twelve months: (1) because of the birth of the employee's child, in order to take care of the child; (2) because of the placement of a child with the employee for adoption or foster care; (3) in order to care for the employee's child, spouse or parent, if the child, spouse or parent has a serious health condition; or (4) because of a serious health condition that makes the employee unable to perform the functions of the employee's position. 29 U.S.C. § 2612(a)(1). When leave is required for the serious health condition of the employee's spouse, child or parent, the employee may take intermittent or reduced leave. 29 U.S.C. § 2612(b). After a period of qualified leave, an employee is entitled to reinstatement to the former position or an equivalent one with the same benefits and terms. 29 U.S.C. § 2614(a). The FMLA declares it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" in the FMLA. 29 U.S.C. § 2615(a). The FMLA similarly declares it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" under the FMLA. 29 U.S.C. § 2615(a)(2).

Williams asserts two violations of the Family and Medical Leave Act. In Count I, Williams contends that Shenango improperly interfered with his right to take medical leave pursuant to 29 U.S.C. § 2615(a)(1). In Count II, Williams alleges that Shenango discharged him in retaliation for having taken FMLA leave, and that such retaliation violates the provisions of 29 U.S.C. § 2615(a)(2). Shenango counters that

Williams' claims are deficient, as a matter of law, in three respects. First, Shenango argues that Williams' failure to provide medical certification, pursuant to 29 C.F.R. § 825.116 (1993),[5] is fatal to both his claim for interference and his claim for retaliation. Second, Shenango contends that, even if the FMLA were implicated in this case, Williams received any leave he was entitled to and was not disciplined in retaliation for taking such leave. Finally, Shenango urges, in the alternative, that Williams cannot establish that Shenango's articulated reasons for discharging him were pretextual.

Research did not disclose any decisions by the Third Circuit court addressing the analytical frameworks for FMLA claims under §§ 2615(a)(1) and 2615(a)(2). Other federal district courts have, however, authored opinions which provide guidance. As to the standard to be employed in assessing a claim under § 2615(a)(1), the United States District Court for the Northern District of Georgia engaged in an exhaustive analysis of the statutory text and legislative history:

[t]he legislative history of the FMLA is silent regarding the proper legal standard to be used when reviewing FMLA claims under 29 U.S.C. § 2612(a)(1). The plain meaning of "shall be unlawful" as used in the text of § 2615(a)(1) however, strongly suggests a strict liability standard applies for any "denial" or "attempt to [deny]" the exercise of a right provided under the FMLA. 29 U.S.C. § 2612(a)(1). When a statute uses mandatory language, such as "shall" rather than "may", the Supreme Court has interpreted the statute to exclude discretion to take account of equitable or policy factors, in this case the *mens rea* of the defendant when allegedly denying valid FMLA intermittent leave.... Similarly, the use of "shall be unlawful" suggests that any employer who violates § 2615(a)(1) of the FMLA is strictly liable, regardless of the intent of its actions.

The FMLA read as a whole further supports a strict liability standard.... The purpose of the lack of language addressing the intent of the employer to violate the

---

5. Because the events giving rise to Williams' claims occurred while the 1993 regulations were in place, this Court will look to the 1993 regulations in addressing Shenango's motion.

FMLA in § 2615(a)(1) is made clear by 29 U.S.C. § 1617's liquidated damages provisions for "good faith" violations.... The presence of a reduced damage option for courts who find a defendant acted unintentionally or violated the FMLA in "good faith" means that even unintentional violators are still liable and thus supports a strict liability approach for 29 U.S.C. § 2612(a)(1).

Finally, the legislative history of the Act evinces Congress's intent to implement the FMLA as a successor to federal labor laws establishing minimum standards for employment:

> The [FMLA] accommodates the important societal interest in assisting families, by establishing a minimum labor standard for leave. The bill is based on the same principle as the child labor laws, the minimum wage, Social Security, the safety and health laws, then pension and welfare benefit laws, and other labor laws that establish minimum standards for employment.

S.Rep. No. 103–3 at 6, U.S.C.C.A.N. at 7. Accordingly, by establishing a "minimum standard" for employee leave, Congress apparently intended for FMLA leave protected by § 2612(a)(1) to be strictly enforced with any question of an employer's intent to violate the FMLA to be considered only when assessing damages.

*Kaylor v. Fannin Regional Hosp., Inc.*, 946 F.Supp. 988, 996–97 (N.D.Ga.1996) (footnote and citations omitted). As did the *Kaylor* court, I find that a claim under § 2615(a)(1) is governed by a strict liability standard.

The *Kaylor* court also provides guidance as to the correct legal standard to be employed in assessing Williams' claim in Count II under 29 U.S.C. § 2615(a)(2):

> [u]nlike § 2615(a)(1), the legislative history on the legal standard Congress intended to be applicable to § 2615(a)(2) is relatively clear. Congress clearly contemplated that the proper framework for analyzing a retaliation claim based on circumstantial evidence under § 2615(a)(2) of the FMLA is the shifting burdens of proof analysis established in *McDonnell Douglas Corp. v.*

*Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 ... (1973)....

*Kaylor*, 946 F.Supp. at 999–1000. *See also Oswalt v. Sara Lee Corp.*, 889 F.Supp. 253, 258–59 (N.D.Miss.1995); *aff'd,* 74 F.3d 91 (5th Cir.1996); and *Burress v. Sears, Roebuck and Co.*, 1996 WL 634209 at * 6 (S.D.Ohio April 18, 1996). As recently explained by the Third Circuit court in *Sheridan v. E.I. DuPont de Nemours and Co.*, 100 F.3d 1061, 1065–67 (3d Cir.1996), the *McDonnell Douglas* "shifting burdens of proof" analysis requires: first, that the plaintiff establish a *prima facie* case of employment discrimination; second, that the employer proffer a nondiscriminatory reason for its adverse employment action; and third, that the plaintiff must then show that the employer's proffered explanations were pretextual.

*(A). Counts I and II—Necessity of Providing Medical Certification*

Shenango contends that Williams cannot establish a *prima facie* case because he was not "needed to care for an immediate family member with a serious health condition." (Docket No. 10, p. 21). Shenango notes that Williams' proffered reason for leave was for the care of his children, who were not ill, rather than for his wife, who was ill. According to Shenango, Dr. Udekwu's letter dated September 15, 1994 confirms that Williams was needed to care for his *children.* (Docket No. 10, p. 21). Shenango faults Williams for having failed to provide any "certification from a health care provider, or any other competent evidence, that he was needed to care for his wife upon her release from the hospital." (Docket No. 10, p. 22).

Though Shenango may be correct that Williams did not timely provide medical certification, or articulate that he needed leave to care for his wife, in addition to his children, I do not believe that this failure is fatal to his claim at this procedural juncture. Shenango's argument is faulty in that it is premised upon the mistaken belief that "[t]he Regulations in effect at the time *required* a medical verification specifically stating that a family member was a needed caregiver and the nature of the care the family member was

needed to provide." (Docket No. 10, p. 22) (*citing,* 29 C.F.R. § 825.116) (emphasis added). Section 825.116 provides, in relevant part:

(a) The medical certification provision that an employee is "needed to care for" a family member encompasses both physical and psychological care. It includes situations where for example, because of a serious health condition, the family member is unable to care for his or her own basic medical, hygienic, or nutritional needs or safety, or is unable to transport himself or herself to the doctor, etc. . . . .

29 C.F.R. § 825.116(a)(1993).

Contrary to Shenango's belief, § 825.116(a) does not *require* medical certification, rather it merely references "the medical certification provision." As such, § 825.116 cannot be viewed in a vacuum. Section 825.100 makes clear that a medical certification is not statutorily *required:*

(d) The employer has the right to 30 days advance notice from the employee where practicable. In addition, the employer *may* require an employee to submit certification from a health care provider to substantiate that the leave is due to the serious health condition of the employee or the employee's immediate family member. . . .

29 C.F.R. § 825.100 (1993) (emphasis added). The use of the discretionary "may" clearly indicates that certification is not mandated in every instance. Rather, the employer is left to decide whether or not to initiate a policy requiring certification.

Assuming Shenango's contention is that it had, in fact, initiated such a policy, that contention would similarly fail. Section 825.301, which sets forth various notice requirements, explains that ". . .when an employee provides notice of the need for FMLA leave, the employer *shall* provide the employee with notice detailing the specific expectations and obligations of the employee and explaining the consequences of a failure to meet these obligations." 29 C.F.R. § 825.301(c) (1993) (emphasis added). "Any requirement for the employee to furnish medical certification of a serious health condition and the consequence of failing to do so," is listed as an instance requiring such specific notice. *Id.* Further, § 825.305 provides that "[a]n employer must give *written notice* of a requirement for medical certification (see § 825.301) in a particular case. . . ." 29 C.F.R. § 825.305.[6]

Shenango has not identified any written guidance concerning its employees' FMLA entitlements during the relevant time period. Nor has Shenango proffered any testimony that Williams was timely notified, in writing, of the necessity of tendering a medical certification,[7] much less what the certification should include, or the consequences of failing to tender one.

To the extent that Shenango challenges the sufficiency of Williams' notice of FMLA leave, reasonable minds may differ as to whether the notice was sufficient. Williams testified during his deposition that he first informed Shenango of the future necessity of taking leave when his wife went in for surgery, approximately three months prior to her surgery. Williams Depo., p. 72. Admittedly, Williams did not mention the FMLA, or state explicitly, at that time, that he needed leave in order to care for his wife. Yet Shenango has not cited any case law suggesting that certain "magic words" were needed.

---

**6.** In its Reply Brief, Shenango contends that Williams may not assert a private cause of action based upon the failure to comply with FMLA notice requirements. While Shenango may well be correct, I need not reach that decision. The Complaint does not articulate such a claim, nor does Williams appear to be pursuing such a claim. Rather, Williams' citation to notice requirements appears to be in the context of explaining how Shenango, which failed to comply with such requirements, cannot use Williams' failure to tender medical certification as a means of denying his claim. Certainly, this is the context in which this Court relies upon the notice requirements.

**7.** This Court is unable to determine, from the excerpt of the Demoise transcript, precisely when Shenango gave Williams the medical certification form. It appears, from other evidence of record, that the tendering of the certification form occurred after leave was taken. In any event, there is no evidence of record that Shenango provided Williams with written notice of the requirement, or of the implications of failing to meet the requirement.

Indeed, subsequent amendments to the regulations explain that:

> [a]n employee shall provide at least verbal notice sufficient to make the employer aware that the employee needs FMLA-qualifying leave, and the anticipated timing and duration of the leave. The employee need not expressly assert rights under the FMLA or even mention the FMLA, but may only state that leave is needed for an expected birth or adoption, for example. The employer shall inquire further of the employee if it is necessary to have more information about whether FMLA leave is being sought by the employee, and obtain the necessary details of the leave to be taken. In the case of medical conditions, the employer may find it necessary to inquire further to determine if the leave is because of a serious health condition and may request certification to support the need for such leave.

29 C.F.R. § 825.302(c)(1995).

Thus, once the circumstances suggest that FMLA leave may be involved, the employer has an obligation to inquire further in order to ascertain the specific details. The parties do not dispute that Shenango did not inquire further of Williams when he requested leave. In fact, the record suggests that the employee interacting with Williams was unfamiliar with the FMLA and the duty to inquire further. If Shenango had inquired further, and explained the circumstances under which FMLA leave is appropriate, Williams may have been able to tender any necessary documentation. Indeed, during litigation of this action, Williams produced a letter from his wife's physician explaining that during Mrs. Williams' six day hospitalization and six week recuperation period at home, she "would have required assistance with basically all the activities of daily living including bathing, preparing meals, personal hygiene, and su-

pervision of her medication." *See* Exhibit 5A to Docket No. 14).[8]

Thus, given the circumstances present in this case, I do not believe that Williams' failure to provide timely medical certification is fatal to his claim. Consequently, Shenango's Motion for Summary Judgment is denied in this regard.

### *(B). Count I—Receipt of Leave*

█ Shenango argues, in the alternative, that Williams cannot establish a *prima facie* case under the FMLA because he received any leave to which he was entitled. (Docket No. 10, p. 22).[9] According to Shenango, once it learned that Williams' leave of absence during the week of July 21, 1994 may have qualified under the FMLA, it changed Williams' five day suspension to a four day suspension. The reduction in suspension time was based upon the elimination from the charges of discipline of unauthorized absences the week of July 21, 1994. (Docket No. 10, p. 23). Shenango thus concludes that "since Williams received leave and was not disciplined for taking or requesting leave, he cannot prove a prima facie case, and his FMLA claim should be dismissed." (Docket no. 10, p. 23).

Williams counters that the term "interfering with" an employee's exercise of FMLA rights includes discouraging an employee from using such leave. (Docket No. 15, p. 12). Indeed, § 825.220(b) provides that " '[i]nterfering with' the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave." 29 U.S.C. § 825.200 (1993). The undisputed record evidence shows that, when Williams notified Shenango of the necessity of leave, Shenango denied the request, and suggested that Williams request a different week for leave. The denial of the request could certainly be construed as inter-

---

8. Dr. Udekwu's letter indicating that Mrs. Williams needed assistance following surgery appears to be at odds with the Occupational Therapy Assessment, which provided that she was self-sufficient. However, any discrepancies serve only to create genuine issues of material fact which prevent the entry of summary judgment.

9. Shenango also contends that Williams was not disciplined for taking FMLA leave. Even if true, the absence of discipline would not defeat a claim, under Count I, that Shenango "interfered with" Williams' rights under the FMLA. Rather, the absence of discipline is relevant only to the claim, in Count II, of retaliation. It will, therefore, be addressed only in this context.

fering with the exercise of FMLA rights, as could Shenango's suggestion that Williams take leave on a different week. Indeed, when Williams left, against orders denying him leave, he may have believed that he was doing so at his own risk, and without the assurances sought to be provided under the FMLA. The lack of assurances could be construed as "discouraging" an employee from asserting FMLA rights. The fact that Shenango may, ultimately, have retroactively designated this leave as covered by the FMLA does not negate the possibility that its initial response to Williams' request may have "chilled" or otherwise discouraged Williams' assertion of FMLA rights. Certainly, Shenango has not identified any cases suggesting that § 2615(a)(1) violations may be retroactively remedied. Reasonable persons could conclude that the initial denial of leave and the suggestion of rescheduling leave may, in fact, constitute "interference with" FMLA rights. Accordingly, Shenango's Motion for Summary Judgment, as to Count I, is denied on this ground.

*(C). Count II—Retaliation*

 I similarly find that genuine issues of material fact exist with respect to Williams' claim, as set forth in Count II, that he was suspended and ultimately discharged, in retaliation for having taken FMLA leave. For instance, Shenango does not dispute that Williams' absence on July 14, 1994 was included for calculation purposes, in its decision to place him on suspension. Shenango does not characterize the July 14, 1994 absence as outside the protection of the FMLA, rather, it argues that the inclusion of the absence in suspending Williams was immaterial—that Williams had enough absences to merit the suspension even without reliance upon the July 14, 1994 absence. Regardless of the "materiality" of the reliance upon this absence, however, the very *inclusion* of the

perhaps FMLA-protected absence on a discipline record could lead reasonable persons to conclude that Williams was being retaliated against for exercising FMLA rights.

Further, Shenango admits that Williams' suspension and ultimate discharge were predicated in part, upon his having left work prior to the arrival of his replacement on August 7, 1994 and again on September 23, 1994. Williams contends that he needed to leave at a certain time, on each of these two days, in order to return home to care for his recuperating wife. Williams apparently relied upon public transportation, a fact of which he contends his superiors were aware. *See* Williams Affidavit, ¶¶ 4–5.

Shenango does not challenge Williams' early departures on these days as not covered by the FMLA. The FMLA contemplates "intermittent leave." 29 C.F.R. § 825.302(f) (1993). Construing the facts in a light most favorable to Williams, the non-moving party, genuine issues of material fact exist as to whether the early departures on August 7th and September 23rd were covered by the FMLA. If covered, Shenango's inclusion of these alleged infractions in calculating Williams' suspension could certainly be construed as retaliatory.[10]

Given the identification of certain genuine issues of material fact concerning Williams' claim, under Count II, of retaliation, Shenango's argument that Williams cannot establish a *prima facie* claim is without merit. Consequently, Shenango's Motion for Summary Judgment is denied in this respect.

*(D) Count I—Evidence of Pretext*

Finally, Shenango contends that "Williams cannot show that Shenango's reasons for disciplining and discharging him were pretext for discrimination under the FMLA." (Docket No. 10, p. 23).[11] As stated above, once a

---

**10.** In its Reply Brief, Shenango faults Williams for not having earlier identified the August 7th and September 23rd early departures as FMLA-related. (Docket No. 19, p. 8–9). Shenango does not contend that Williams' failure to "more timely" identify these alleged infractions as FMLA-related somehow estops him from so characterizing them now. Thus, if, as Shenango alleges, Williams did not previously characterize

the early departures as FMLA-related, such failure would go to Williams' credibility.

**11.** Shenango "assum[es] for the purposes of this Brief only that Williams can establish a prima facie case on this claim by asserting that employees who did not request FMLA leave were not discharged...." (Docket No. 10, p. 23). Contrary to any implication by this statement, She-

plaintiff has established a *prima facie* case, the burden of production shifts to the defendant, who must articulate a legitimate nondiscriminatory reason for the action taken. Shenango contends that it has satisfied this burden and that the burden of production thus shifts back to Williams, who must show that the asserted reason for the action taken was pretext for discrimination. According to Shenango, "Williams cannot meet this burden." (Docket No. 10, p. 24).

 I must, therefore, "determine whether the plaintiff has cast sufficient doubt upon the employer's proffered reasons to permit a reasonable factfinder to conclude that the reasons are incredible...." *Sheridan v. E.I. DuPont de Nemours and Co.*, 100 F.3d 1061, 1072 (3d Cir.1996). A "plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent or competent." *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir.1994). "Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence,' ... and hence infer 'that the employer did not act for the asserted non-discriminatory reasons.' " *Fuentes*, 32 F.3d at 764 (emphasis in original) (internal citations and brackets omitted).

 In discharging this burden, a plaintiff may rely upon evidence supporting the *prima facie* case. *Sheridan*, 100 F.3d at 1069. The underlying evidence and inferences properly drawn therefrom may be considered on the issue of whether the defendant's explanation is pretextual. *Id.* (citations omitted). Additionally, a court may consider the *timing* of certain events in assessing evidence of pretext. *See Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 639 (3d Cir.1993) (stating that "[t]he timing

of an employee's dismissal may raise an inference that an employer's purported reasons for terminating him were pretextual"); and *White v. Westinghouse*, 862 F.2d 56, 62 (3d Cir.1988) (same).

 I find that the evidence proffered by Williams in support of his *prima facie* case, together with the timing of the discipline, creates genuine issues of material facts as to whether Shenango's articulated nondiscriminatory reasons for discipline are pretextual. The facts indicate that, on August 25, 1994, Williams received a four-day suspension. This suspension occurred within a few weeks of returning from his FMLA leave. Within a month of the initial suspension, Williams received a five-day suspension, allegedly based upon his departure from work prior to the arrival of his replacement. Approximately two weeks later, on October 4, 1994, Williams and Shenango executed an "Absolute Last Chance Agreement." The Agreement granted Shenango the "unilateral right" to discharge Williams for "any infraction."

A reasonable person may find it curious that, within approximately three months of taking FMLA leave, and after more than twenty years of employment by Shenango, Williams was subject to a Last Chance Agreement. Although, as Shenango contends, Williams may indeed have escaped discipline for several rules infractions prior to his taking FMLA leave, it may be significant that the "avoidance of discipline" ended shortly after his having taken FMLA leave. I therefore find that sufficient facts exist from which a reasonable person may find Shenango's articulated nondiscriminatory reasons for suspending, and ultimately terminating Williams, to be pretextual. Consequently, Shenango's Motion for Summary Judgment is denied in this respect.

---

nango has not challenged Williams' retaliation claim on the ground that "other employees who did not request FMLA leave were similarly disciplined." Rather, Shenango simply argued, with respect to the FMLA claim, that Williams was not covered by the Act, that Williams received

any leave to which he was entitled, and that Williams was not disciplined for taking leave. Consequently, the issue of Williams' treatment, as compared to other employees who did not request leave, is not, for purposes of establishing a *prima facie* case, before this Court.